## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. Andrea Randle, | )<br>)<br>) |
| Plaintiff-Relator, | )<br>) |
| v. | )<br>) |
| THE KANSAS CITY, KANSAS<br>HOUSING AUTHORITY (KCKHA): | )<br>)<br>) |
| *KCKHA ADVISORY BOARD*<br>MEMBERS: MATTHEW<br>WATKINS; PAUL JONES;<br>DR. NOZELLA BROWN; LINDA<br>WARNER; PATRICIA ANNE<br>McDONALD; CARLA<br>WHITESIDE-HICKS; JOHN D.<br>RIOS; DR. CHIQUITA MILLER;<br>JACQUES BARBER; CHANDRA<br>WARD; RAUL SAENZ ESCARGA;<br>RODERICK McCONNELL; | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| *KCKHA EMPLOYEES*:<br>ANDREA TAPIA;<br>DEBORAH THOMPSON; MONICA<br>LOPEZ; ANWAR CROCKETT;<br>JEROME HOOKS; JANE DOES 1-3 | )<br>)<br>s)<br>)<br>) |
| and | )<br>) |
| THE UNIFIED GOVERNMENT OF<br>WYANDOTTE COUNTY AND<br>KANSAS CITY, KANSAS | )<br>)<br>) |
| Defendants. | )<br>)<br>) |

**Case No.** 2:25-cv-02286-JWL-GEB \*SEALED\*

*FILED IN CAMERA*
*and UNDER SEAL*

**FALSE CLAIMS ACT COMPLAINT**

### COMPLAINT AND JURY DEMAND

The Plaintiff United States of America ex rel. Andrea Randle (hereafter "Plaintiff" or

"Relator" or "Randle"), by and through her counsel, brings this action on behalf of the United

States of America, and on her own behalf, against the Kansas City, Kansas Housing Authority (KCKHA), individual KCKHA employees, the 12 members of the KCKHA Advisory Board, and the Unified Government of Wyandotte County and Kansas City, Kansas, pursuant to the Qui Tam provisions of the Federal False Claims Act, 31 U.S.C. §§3729-33 (Federal FCA or FCA, referred to as a "Qui Tam Action"). Pursuant to 31 U.S.C. §3730(b)(2), this action is brought *in camera* and under seal.

Plaintiff further raises civil rights claims under 42 U.S.C §1983, the First and Fourteenth Amendments to the United States Constitution, the Federal Fair Housing Act, 42 U.S.C. §3612(o), and the Kansas Consumer Protection Act, K.S.A. § 50-623, et seq.

Plaintiff alleges that KCKHA and its employees repeatedly violated the FCA and other federal and state laws by knowingly presenting or causing to be presented material false or fraudulent claims for payment to the United States, knowingly making or using material false records or statements for payment by the United States, and conspiring to commit FCA violations, extorting and depriving Plaintiff of benefits under the Supplemental Nutrition Assistance Program ("SNAP") and forcing her to surrender her Electronic Benefit Transfer ("EBT") card as a condition of obtaining housing with KCKHA. Whenever Randle tried to stop the ongoing extortion of her family's food stamp benefits, KCKHA employees retaliated, charging her bogus fees, threatening her verbally in public and, taking steps to evict her, and filing lawsuits to evict her and collect money.

In addition to her other claims alleging violations of United States Constitution and federal and state law, Plaintiff alleges that Defendants violated the Federal FCA by knowingly illegally and fraudulently using SNAP benefits for their own purposes. Plaintiff further alleges that Defendants misused federal funds from Department of Housing and Urban Development, using

HUD funds to illegally "cover" other expenses of tenants while they extorted their food stamp benefits. This fraudulent scheme operated by KCKHA employees was aimed at extorting the most vulnerable tenants, such as Randle.

## **Introduction**

1. When Andrea Randle applied in 2022 for public housing at the KCKHA, she hit a roadblock she'd known nothing about. Deborah Thompson, the head of "Tenant Selection," told Randle in a phone call that she was on the "banned list" based on a complaint allegedly made more than a decade earlier during a previous tenancy. No one had ever informed Randle of this complaint or given her a chance to respond.

2. The complaint had supposedly been made by Randle's former mother-in-law with whom she'd had a rocky relationship and who had jumped into a disagreement between Randle and her ex-husband.

3. Randle immediately felt that Thompson was using the alleged "complaint" as leverage over her. Thompson commented that Randle had never received a hearing about the "complaint," but she did not offer one either. Instead, she suggested that Randle could be denied public housing because of the "complaint."

4. Thompson knew that Randle was desperately in need of housing and that she had children. Thompson, as head of "Tenant Selection," exercised total control over which tenant applications would be approved and which would not.

5. During their first phone call, Thompson asked Randle if she received food stamps. Thompson wanted a screenshot of the EBT card. Later, at their first meeting, Thompson

directed Randle to hand over her EBT card and stated that she, Thompson, would "hold onto it."

6. It was clear to Randle that she would not be approved for housing and be removed from the "banned" list unless she complied with Thompson's demands.

7. The school year was fast approaching, and Randle needed housing for herself and her three sons. Feeling she had no choice, she reluctantly surrendered her food stamp card.

8. Although Randle hoped the card would soon be returned, she discovered that Thompson and other KCKHA employees were passing around the card and purchasing food for themselves and their families. While KCKHA employees stole her SNAP benefits, Randle was sent to a nearby food bank to feed her family.

9. The KCKHA director, Andrea Tapia, knew about the theft of Randle's food stamps and did nothing to stop it. In fact, Thompson disclosed that Tapia herself was "interested" in Randle's EBT card.

10. It was soon apparent to Randle that multiple employees were using her EBT card, including Thompson, her assistant Monica Lopez, and others in the office.

11. The extortion of benefits was not limited to Randle. The first time Randle met Thompson in her office, a young boy came to the door and requested his mother's EBT card. Randle watched as Thompson reached into her purse, pulled out the card, and handed it to the boy.

12. KCKHA's executive staff controlled Randle's housing, and they made clear to her that they could evict her at any time. Whenever Randle resisted their use of her EBT card, she would be threatened with inflated rent invoices and eviction papers. But Randle was afraid to complain.

13. Randle feared being put out on the street with her three sons, broke, without SNAP benefits and nowhere to go.

14. In July 2023, Randle informed Executive Director Tapia that she had made a report to federal authorities about the extortion of her SNAP benefits. Shortly afterward, KCKHA retaliated by filing a summons and lawsuit for forcible eviction along with a demand for unpaid fees and charges.

15. The unlawful and predatory actions of the KCKHA and its employees compromised the physical and mental health and well-being of Randle and her children. Ultimately, Randle was forced to leave KCKHA housing even though she had not yet secured another place to live.

Plaintiff demands a jury trial on all claims so triable. Plaintiff requests that trial be held in Kansas City, Kansas.

## JURISDICTION AND VENUE

16. This action is brought under the following Federal Constitutional Amendments and statutes:

(a) the Federal False Claims Act, 31 USC §3729(a)(1);

(b) the First and Fourteenth Amendments to the United States Constitution and 42 US.C. §1983; and

 (c) 42 U.S.C. §§3601-3631, referred to as the "Fair Housing Act."

17.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1345, and 31 U.S.C. §§3732(a) and 3730.

18. The Court has jurisdiction over Plaintiff's claims under Kansas law pursuant to 28 U.S.C. § 1367 because such claims are so related to claims in the action within the original jurisdiction of the Court that they form part of the same case or controversy.

19. Venue is proper in the District of Kansas as the Defendants can be found in, reside in, and/or transact business in this judicial district. Therefore, within the meaning of 28 U.S.C. §1391(b) and (c) and 31 U.S.C. §3732(a), venue is proper.

20. To Plaintiff/Relator's knowledge, jurisdiction over this action is not barred by 31 U.S.C. 3730(e): there is no civil suit or administrative proceeding involving the allegations and transactions herein to which the United States is a party; there has been no "public disclosure" of these allegations or transactions; and Relator is the "original source" of the information on which these allegations are based.

## **PARTIES**

21. Plaintiff Andrea Randle is a citizen of the United States of America. At all times relevant to this Complaint, she was a resident of the State of Kansas. Plaintiff brings this action based upon direct and unique information obtained during the period of her residency in housing units of the Kansas City, Kansas Housing Authority. As characterized by the Federal False Claims Act, Plaintiff will often be referred to as "Relator" in this Complaint. Relator will serve upon the United States, with this Complaint, evidence in her possession and within her knowledge by way Relator's "Disclosure Statement."

22. The Kansas City, Kansas Housing Authority (KCKHA) operates and manages the public housing program in Kansas City, Kansas, and administers the Housing Choice Voucher Program in Kansas City, Kansas. The KCKHA's central office is located at 1124 N. 9th Street, Kansas City, Kansas. In a February 2024 filing with the Kansas Secretary of State,

the KCKHA identified itself as a not-for-profit corporation, listing Andrea Tapia as its resident agent.  Its status prior to the February 2024 filing could not be ascertained through Secretary of State records.

23.  Under the authority of K.S.A. 17-2339, *et seq.,* the Unified Government of Wyandotte County and Kansas City, Kansas (UG) created the KCKHA to operate and maintain public housing in Kansas City, Kansas.  Pursuant to state law and local ordinance, the UG delegated its powers and authority over public housing to the 12-member KCKHA Advisory Board.  *See* Ord. Section 2-436 through 2-440. The Unified Government retained authority over its agent by reserving the power to appoint all 12 members of the KCKHA Advisory Board, with 10 being members appointed by the UG Commission and two being appointed by the Mayor of Kansas City, Kansas.

24.  The KCKHA Advisory Board oversees and directs all aspects of the housing agency and is responsible for ensuring proper management and compliance with all federal, state and local laws and regulations as well as adherence to the agency's mission. The Advisory Board holds regular meetings and is responsible for hiring and supervising the KCKHA executive director, approving policies, ensuring financial stability and the proper management of properties.

25. The federal government, through the Department of Housing and Urban Development (HUD), provides federal funds for the KCKHA to construct, maintain and operate public housing in Kansas City, Kansas.  Federal funding for specific local housing purposes also flows through specific federal grants to the Unified Government.

26. The UG is the successor of the municipality, the City of Kansas City, Kansas.  The Unified Government was created by and established under the law of the State of Kansas in 1997.

It is authorized to be sued in its own name. Its headquarters is located at 701 N. 7th Street, Kansas City, Kansas.  The City of Kansas City, Kansas, is a subdivision of the Unified Government and is located within Wyandotte County.

27.  Matthew Watkins is the Chair of the KCKHA Advisory Board and was appointed to the Board by the Unified Government Commission.  He represents District 7 and is a resident of the State of Kansas.

28. Paul Jones is a Commissioner on the KCKHA Advisory Board and was appointed by the Mayor of Kansas City, Kansas. Jones is a resident of the State of Kansas.

29. Dr. Nozella Brown is a Commissioner on the KCKHA Advisory Board and was appointed by the Unified Government Commission. She represents District 1. Brown is a resident of the State of Kansas.

30.  Linda Warner is an At-Large Commissioner on the KCKHA Advisory Board and was appointed by the Unified Government Commission.  Warner is a resident of the State of Kansas.

31.  Patricia Anne McDonald is a Commissioner on the KCKHA Advisory Board and was appointed by the Unified Government Commission. She represents District 2. McDonald is a resident of the State of Kansas.

32. Carla Whiteside-Hicks is an At-Large Commissioner on the KCKHA Advisory Board.  She was appointed by the Unified Government Commission. Whiteside-Hicks is a resident of the State of Kansas.

33. John D. Rios is a Commissioner on the KCKHA Advisory Board and was appointed by the Unified Government Commission.  He represents District 3. Rios is a resident of the State of Kansas.

34. Dr. Chiquita Miller is a Commissioner on the KCKHA Advisory Board and was appointed by the Unified Government Commission.  She represents District 4.  Miller is a resident of the State of Kansas.

35. Jacques Barber is a Commissioner on the KCKHA Advisory Board and was appointed by the Unified Government Commission.  He represents District 5.  Barber is a resident of the State of Kansas.

36. Chandra Ward is a Commissioner on the KCKHA Advisory Board and was appointed by the Unified Government Commission.  She represents District 6.  Ward is a resident of the State of Kansas.

37. Raul Saenz Escarcega is a Commissioner on the KCKHA Advisory Board and was appointed by the Unified Government Commission. He represents District 8.  Escarcega is a resident of the State of Kansas.

38. Roderick McConnell is a Resident Commissioner on the KCKHA Advisory Board and was appointed by the Mayor of Kansas City, Kansas. McConnell is a resident of the State of Kansas.

39. At all times relevant to this action, Andrea Tapia was the Executive Director and CEO of KCKHA.  She is a resident of the State of Kansas. She is sued in her individual capacity.

40. At all times relevant to this action, Deborah Thompson was the head of "Tenant Selection" at the KCKHA until mid-2023 when she was terminated.  She is a resident of the State of Kansas. She is sued in her individual capacity.

41. At all times relevant to this action, Monica Lopez was an assistant working in "Tenant Selection" at the KCKHA until mid-2023 when she was terminated. She is a resident of the State of Kansas. She is sued in her individual capacity.

42. At all times relevant to this action, Anwar Crockett was the Assistant Director of Housing Operations and Facility Management at KCKHA. He is a resident of the State of Kansas. He is sued in his individual capacity.

43. At all times relevant to this action, Jerome Hooks was an assistant in Housing Operations and Facility Management at KCKHA. He is a resident of the State of Kansas. He is sued in his individual capacity.

44. Jane Does ## 1 – 3 are other employees of the KCKHA whose identities are presently unknown but who were involved with the acts alleged in this Complaint. They are sued in their individual capacities.

45. All individual Defendants, at all times relevant to this action, were acting within the scope of their employment or official duties, and, further, were acting under color of law pursuant to the statute, ordinances, regulations, policies and customs of the Kansas City, Kansas Housing Authority and the Unified Government. The individual Defendants are sued in their individual capacities.

## FACTS

46. In 2022, Andrea Randle was in the process of moving from Las Vegas back to Kansas City, Kansas, her hometown. She and her three sons urgently needed a place to live before the start of the upcoming school year. Randle had been through a rough patch in her life and hoped that public housing would allow her to stabilize and rebuild.

47. Randle's hope for safety and stability was soon crushed. From the time of her contact with the KCKHA in 2022, Randle was extorted by the agency's staff who conspired to extort her SNAP benefits for their own use. The head of "Tenant Selection," Deborah Thompson, had an ongoing fraudulent scheme with others, including assistant Monica Lopez and

Executive Director Andrea Tapia, into which she forced the most vulnerable residents, including Randle.

48. When Randle first contacted KCKHA on the phone, she was still in Las Vegas and researching her options. During the call, Thompson asked Randle if she received food stamps. Randle replied "yes," but did not know why Thompson was asking. Thompson said that if Randle had an EBT card, she had a place for her. Randle assumed this had something to do with her eligibility for public housing.

49. Thompson also asked Randle the amount of food stamp benefits she received monthly and asked to be sent a screenshot confirming the benefits. Thompson then turned to another topic, mentioning two names to Randle, and asking her who they were. The two individuals were Randle's ex-husband and his mother. Thompson offered no specifics, but said Randle was on a "banned list" because of an alleged "complaint" by her ex-husband's mother.

50. Randle had never been given notice of this purported complaint and did not even know it existed. Thompson told her that people who are put on the list normally get a hearing, but Randle had not gotten one. Thompson's comments instilled fear and worry in Randle.

51. Thompson gave Randle her phone number and told her to call when she arrived in Kansas City. She also said it would take three or four weeks to get into a public housing unit. She told Randle not to speak with anyone at the KCKHA office except her.

52. When Randle and her sons arrived in Kansas City, Randle contacted Thompson as she had been told to do. Thompson directed her to come to the KCKHA office and to bring her EBT card.

53. As soon as Randle arrived at the office, Thompson asked if she had brought the EBT card with her. Thompson directed her to hand over the card, and Randle, seeing no alternative,

reluctantly handed it over. She wasn't sure at that point what Thompson planned to do, but watched as Thompson slipped the card into Thompson's purse.

54. Randle was shocked and confused.  The only other income her family had at that time was Social Security disability. Without an EBT card, Randle did not know how she would feed her sons.

55. Thompson did not notice Randle's distress. Instead, she talked about her daughter's upcoming wedding and told Randle that having the EBT card would "help with the wedding."

56.  Randle was shocked, and her mind was spinning about how to get her card back. She was scared and needed a stable place to live.

57. Randle had previously filled out and submitted an application to KCKHA while she was still living in Las Vegas, but Thompson directed her to fill out a new one.

58. Thompson directed Randle not to put a date on the application. Thompson said she would do that and would take care of submitting the application. Thompson wanted to make sure that Randle was approved for a KCKHA housing unit which, as Randle later discovered, was the means by which Thompson intended to have ongoing control over Randle's SNAP benefits.

59. Thompson told Randle to go to the Willa Gill Center, a social service agency, and get a letter confirming that she was presently homeless, which was true. She also directed Randle to list her mother and stepfather as her landlords on the application.  Randle had indeed stayed with them for periods of time, but she found Thompson's direction strange, and it made her uncomfortable. But Thompson said Randle needed to do it because of past court judgments against Randle.

60. Thompson again brought up the "complaint" and the "banned list."  To emphasize her point, Thompson gestured to her computer screen where Randle's name was supposedly listed.  She said Randle had never been given a hearing, but she didn't offer to arrange one either.  It was clear that the purported "banned list" allowed Thompson to exercise total control over which applicants were accepted or rejected by KCKHA.

61. While Randle was in Thompson's office, a young boy came to the door. He told Thompson that his mother needed her EBT card. Randle saw Thompson reach into her purse, pull out a card and hand it to the boy.

62. After Randle finished the paperwork, she left the office. She felt worried and upset. Randle had never heard anything before about a complaint or being "banned" but it was clear that she had to comply with Thompson's directions.  She did not know when or if her EBT card would ever be returned. During their meeting, Thompson had told her that she would "hang onto" the card and Randle could then get her lease and keys. She also told Randle not to deal with anyone in the KCKHA office other than her.

63. With the start of school approaching, Randle called Thompson every day to see if her housing application had been approved and whether there was a unit ready.

64. One day, Thompson finally told Randle she had been approved and could come pick up a list of prospective housing units. Thompson also told Randle she had gotten her off the "banned list."

65. Randle was relieved she would be getting housing, but she was now without food stamps and had been forced to spend her limited cash to feed her children. On the phone, she told Thompson she did not have enough gas to drive around and look at prospective housing units.

66. Randle headed toward the KCKHA office but quickly hit the bottom of her gas tank. She pulled into a service station at 64th and State and called Thompson.  Thompson told her she had "someone else" who "might want to use" Randle's EBT card and could "help [her] with gas."  That person was Andrea Tapia, the head of the KCKHA.  A few minutes later, Thompson called back and gave Tapia's phone number to Randle and told her to call Tapia.

67. When Randle called, Tapia answered and asked Randle where she was.  Randle told her that she was at a gas station at 64th and State, and Tapia replied: "Stay right there. I'll meet you."

68. Tapia soon arrived and introduced herself. She had brought a man with her whom she introduced as her assistant. Tapia then took out a credit card and filled Randle's gas tank. She also gave Randle a small amount of cash. Randle was surprised, but she was completely broke and without her EBT card. She was grateful for even a few dollars.

69.  Randle went to the KCKHA office and met with Thompson.  She selected a housing unit and signed a lease.  She didn't have enough for a deposit that day but knew she could pay it with her next disability check.

70. Randle was surprised when Thompson handed her some cash and directed Randle to go obtain a money order to pay the deposit.  Thompson also told her not to worry about her utilities; she would get BPU services turned on, and KCKHA would cover utilities other than gas. She also told Randle that the rent would be covered. The entire arrangement depended on Randle giving up her EBT card and SNAP benefits.

71. Randle was startled and upset by Thompson's directions.  She tried to resist, telling Thompson she would have no means to feed her children without food stamps.

72. After listening to Randle's protest, Thompson called Tapia, and Tapia suggested that Randle get food from a nearby food bank, Avenue of Life. They gave Randle the name of a specific person to contact at the food bank.

73. Randle was upset and worried.  Thompson and Tapia had power over her housing, and they were extorting her for food stamp benefits.  Randle felt she had no choice but to comply.

74. Randle realized she was likely not the only resident who was being extorted.  Over the next few months, she frequently saw women and children coming and going from the office, and at times they appeared to be dropping something off or picking something up, such as a card.

75. When Randle moved into her unit, the school year was about to start. Randle was focused on taking care of her sons. The family's income was meagre and primarily consisted of SSI benefits.  Randle stretched the food she could afford and also depended on her family, non-profit agencies, and a helpful neighbor who worked at a restaurant and brought home unsold food at the end of the day.

76. Randle knew that her EBT card, which was linked to her Las Vegas address, would soon be deactivated because she no longer lived in Nevada.  Thompson told her to close her Nevada card and get a Kansas card.

77. While both were sitting in Thompson's office, Thompson directed Randle to start filling out an electronic application for a new EBT card that would be linked to Randle's Kansas address. After Randle opened her food stamp account on her cell phone, Thompson took Randle's phone and typed in information into the account. Thompson then electronically signed and submitted the application for a new EBT card. Randle did not sign the application and did not see the application before Thompson submitted it. Thompson

falsified Randle's electronic signature, thereby falsely submitting a required certification for federal SNAP benefits.

78.  Randle hoped that Thompson would allow her to use to use the SNAP benefits with her new EBT card.  But as soon as Randle's new card arrived, Thompson directed Randle to turn it over to her.  She insisted on getting the card immediately and drove over to Randle's KCKHA housing unit to ensure it was turned over to her as she had directed.  Randle surrendered the card because she had no choice.

79. Thompson's use of Randle's EBT card was part of an ongoing and wider scheme in which Thompson targeted the most vulnerable KCKHA residents and pressured them to surrender their EBT cards to her. Those seeking housing knew they could not get a unit without Thompson's approval, so they would surrender their EBT cards.

80. Throughout the fall, Randle remained chronically short of food.  From time to time, Thompson would provide Randle with a small amount of cash but it was not enough to cover Randle's bills and also buy sufficient groceries.

81. Randle learned that other KCKHA employees, not just Thompson, were passing her card around and using her SNAP benefits.  Executive Director Tapia knew about Thompson's scheme, as indicated by Thompson herself when she told Randle on the day that Tapia filled Randle's gas tank that Tapia was interested in Randle's food stamps.

82. Thompson and Tapia both appeared eager to bring in Randle as a tenant, not because they wanted to help her, but because they wanted her SNAP benefits.  Tapia was also the person who directed Thompson to refer Randle to a nearby food bank, Avenue of Life, when Randle protested that without an EBT card, she would be unable to feed her children.

83. In addition to Tapia and Thompson, at least two other employees knew about or used Randle's food stamp card. One of them was Thompson's assistant, Monica Lopez, who used the card when Thompson allowed her to do so. Other employees, whose names Randle did not know (Jane Does #1-#3), were believed by Randle to have used her EBT card. At least one of them was specifically referred to by Thompson as a card user.

84. On information and belief, Tapia also used Randle's EBT card to redeem SNAP benefits belonging to Randle.

85. Thompson made clear to Randle that to remain in KCKHA housing, she had to comply with all of Thompson's requirements. At all times, Thompson had to be in possession of the EBT card. When Randle needed food for her family, she was directed to contact Thompson and nobody else.

86. Sometimes Randle and her sons were so hungry that she was forced to call Thompson and ask for immediate help. On occasion, Thompson would direct Randle to come to the office and she would hand her a bagful of burgers and fries from a fast-food restaurant. Other times, Thompson gave Randle leftovers from an office party or would give Randle a small amount of cash at the office. Sometimes Thompson would shut her office door when Randle was there, but sometimes she would leave it open.

87. Once or twice a month, Thompson would come to Randle's unit, which afforded more privacy. She would give Randle cash for groceries, typically $50 to $100. A few times, Thompson sent cash electronically, or she would send Lopez over with cash.

88. The small amounts of money, which Randle never felt she could count on, provided a bare minimum of groceries and sometimes not even that. While Thompson and her co-workers enjoyed Randle's SNAP benefits, Randle was chronically short of food, wondering each

day how she was going to feed her family. But Thompson ignored the strain on Randle and her children.

89. Randle also told Thompson that she was also having a hard time providing for her children's other needs and setting up her household.  After that conversation, Thompson came by with some used children's clothing. But she did not give the clothes to Randle; she required Randle to pay for them.

90. Thompson also knew that Randle's unit was pretty bare because she could not afford to furnish it.  Thompson offered to provide some furniture, and Randle went to Thompson's house to help move the items.

91. Thompson gave Randle a sofa, loveseat and table for free, but the items had been heavily used. The frame of the sofa was broken, requiring Randle to support it by sliding a milk crate underneath and lining the bottom with cushions.

92. Lopez also stopped by Randle's unit from time to see if she could get access to Randle's EBT card directly without having to ask Thompson for it.  Randle herself never gave the card directly to Lopez; it was always in Thompson's custody, and Lopez could use the card only when Thompson allowed her to do so.

93. Thompson took further advantage of Randle's poverty by offering to buy Randle's barbecue grill – a prized item in a household with three growing boys, but also one that Randle could no longer afford to keep.  Thompson and her husband came by Randle's unit and paid $100 for the grill, which Randle spent on groceries.

94. Lopez also sought her own bargain deal – she offered to buy Randle's washer and dryer and came by Randle's unit with her son to pick up the appliances. She also paid $100,

which Randle used for groceries. Randle was unable to replace the washer and dryer until months later when she found abandoned appliances on a street curb.

95. Throughout this time, Randle dealt directly with Thompson and Lopez though she knew others in the office were involved and benefitted from her EBT card.

96. One time, when Randle stopped by the KCKHA office to see Thompson, she spoke with Lopez because Thompson was busy. Lopez freely discussed the use of Randle's EBT card but told Randle not to refer to "food stamps" in the office; they were always referred to as "coupons."

97. During 2022, the federal government provided increased SNAP benefits in the wake of the Covid pandemic. Randle had typically received about $900 per month; in the fall of 2022, the amount increased to about $2,000 per month.

98. When Randle viewed the electronic record of purchases on her card in December 2022, she saw that her EBT card was being used all over the city: at two different Price Chopper stores, two Sam's Club stores, two Walmart stores, a Walmart Supercenter, Save-A-Lot, Aldi, Dollar General, Dollar Tree and Quik Trip. Near the holidays in 2022, the card was used nearly daily, in amounts as small as $3.62 and as large as $383.74. On her electronic record, Randle saw purchases on December 7, 8, 12, 13, 18, 19, 20, 28, 30 and 31. On December 18 alone, there were 10 separate purchases at various stores. These purchases were made by Defendants and not by Randle.

99. Randle struggled through the holidays and when January arrived, she decided she was going to get her EBT card back from Thompson. She cancelled her old card—the one that Thompson had—and ordered a new one. Finally, she could buy groceries again.

100.    Randle's relief at receiving SNAP benefits again was short lived.  It was clear to her that Thompson was upset that she no longer had access to Randle's SNAP benefits.

101.    Although Thompson had told Randle that her rent would be "covered" when Thompson was using Randle's EBT card, it was clear that either Thompson lied or that she was again trying to extort Randle and force her, again, to surrender her card.

102.    In February 2023, KCKHA sent Randle a rental invoice stating that she owed $2,827. It listed current and past due amounts, based on a supposed monthly rent of $405. Randle also received a past due BPU bill in the amount of $834.71.  Thompson had previously told Randle not to worry about BPU bills, that BPU would be covered. Now, Randle feared having her utilities cut off.

103.    Randle was very worried and upset. Thompson had indicated that if she could use Randle's EBT card that she would be "covering" the rent.  Now, Randle was finding eviction notices tacked to her door.

104.    Unnerved by the threat of eviction, Randle temporarily moved with her sons to her mother's apartment.  There was very little room there, and they were sleeping on the floor, but it felt safer than Randle's housing unit.

105.    Feeling she had no other options, Randle called the KCKHA office at the end of February.  She spoke with Lopez, who told her that if she brought in her EBT card by 10 a.m. the next day, that they "would see about getting [Randle] back in."

106.    Randle felt she had no other choice. She went into the office the next day and spoke with Thompson. She told her she was upset about the threatened eviction. Thompson replied she would look into it, then asked: "Do you still have your card?"

107.    Desperate for housing, Randle felt she had no choice and surrendered her EBT card to Thompson.

108.    Randle also paid $1,000 to KCKHA, which was all the money she had on hand. This allowed her to move back into her housing unit.  It was not clear to Randle at that point, what rent had been "covered," how much she actually owed, and what her monthly rent supposedly was.

109.    Thompson was in control and could make the KCKHA records reflect anything she wanted. She had told Randle that monthly rental payments *had* been made – though Randle did not know if that was true. She did not know what the KCKHA records showed or whether they had been falsified. She also did not know whether "rent" funds were improperly skimmed off her EBT card or came from KCKHA coffers or were misappropriated from other funding sources. All she knew is that Thompson had told her that rent was "covered."

110.    Thompson and others immediately jumped on the restored access to Randle's SNAP funds, on March 9, 2023, buying groceries at Walmart, Dollar General and Quik Trip, spending $278.91 in one day.

111.    Randle hated being extorted and believed that other KCKHA tenants were being extorted for their food stamp benefits.  Randle was tired of living day to day, not sure how she would be able to feed her children.

112.    In early 2023, Randle suffered a violent physical assault from a former partner, leaving her severely bruised, swollen and very shaken.  Seeking to avoid further confrontations with a man who knew where she lived, Randle requested to move to another housing unit.

113.    The KCKHA allowed Randle to move in March 2023. Initially, the move looked like it was a positive development. But Randle soon learned that her new housing unit was in poor and unsafe condition. There were multiple serious hazards, including an unstable outdoor step and mold in the basement, which was prone to flooding.  Randle was also without a refrigerator for five days.

114.    After the move, Thompson made clear that she wanted to continue with the EBT card arrangement and again threatened Randle with eviction.  Randle told Thompson twice that she did not feel comfortable talking about food stamps. Thompson immediately became suspicious and directed Randle not to tell anyone about the use of Randle's SNAP benefits. She also directed Lopez not to talk to anyone about Randle's SNAP benefits.

115.    In a conversation with Randle, Thompson also defended Tapia, trying to suggest Tapia bore no responsibility for any wrongdoing, stating: "She (Tapia) is a good Christian lady."

116.    Randle was afraid of losing her housing, but she also had growing sons to feed. She cut off access to her EBT card. The fallout from her decision was immediate.  Thompson was upset and pressured Randle to hand over her card again, threatening her with eviction and claiming she owed back rent. She also told Randle she was placing her on the eviction list.

117.    At that point, Randle felt she had no choice but to complain to Thompson's boss, Andrea Tapia.

118.    In July 2023, Randle met with Tapia and Stephanie Drake, KCKHA's human resources director. Randle told them that she had been extorted by Thompson for months

and forced to turn over her food stamps to obtain housing. Randle told Tapia and Drake that her EBT card had been used by Thompson, Lopez and others.

119.     Randle knew that Tapia was already aware of the extortion of her SNAP benefits, as Tapia had been involved at the outset, when Thompson had told Randle that Tapia was another person at KCKHA who was "interested" in Randle's EBT card. But Tapia did not acknowledge her own involvement in the extortion scheme and said nothing in the meeting that acknowledged her awareness of Thompson's actions.  Instead, she told Randle that forcing her to give up her food stamps was "wrong."  Subsequently, Tapia and Drake purported to conduct an internal "investigation," and Thompson and Lopez were reportedly fired, though they remained in close contact with the office.

120.     Randle remained in her housing unit that was unfit and in severe need of repairs but requested that she be moved to a new unit. Around that time, in July 2023, Randle suffered a series of threatening encounters with KCKHA staff who were close friends of Thompson.

121.     Jerome Hooks, who worked in Housing Operations for KCKHA, approached Randle in public, at a store.  He was upset that Thompson had been terminated and warned Randle in a threatening tone: "Watch your back."  On or about July 22, 2023, Randle saw Hooks at an indoor basketball game where one of her sons was playing. Hooks again approached her, threatening her and loudly berating her over the termination of Thompson.

122.     Randle was growing increasingly concerned about her safety. She heard about rumors going around the community that she had caused Thompson's termination.  Randle learned that Thompson had a reputation for breaking the rules and doing improper "favors" for financially stressed people in return for a benefit to her.

123.    Randle's unease with her housing unit continued to mount.    The unit was battered, moldy, filled with hazards and should not have been occupied. Randle's discomfort mounted further when she heard gunshots in the neighborhood.

124.    When she complained to KCKHA about the unsafe conditions, Anwar Crockett, assistant director of housing operations and management, was assigned to help her.

125.    Randle soon learned that Crockett was a friend of Thompson's.  He confronted Randle angrily, berating her as a "snitch." Referring to Randle's complaint about Thompson, Crockett stated: "That's fucked up!" With a threatening tone, Crockett told her that she needed to "watch her back."

126.    Crockett never helped Randle locate another housing unit, as he was assigned to do. The one unit he showed her was in extremely poor condition and behind a liquor store.

127.    Randle felt unsafe and tried to report the threats by Hooks and Crockett to the Kansas City, Kansas Police Department, but the officer would not help her or even take a report. Officer Kevin Duong told Randle that because the threats concerned a SNAP issue that it was a "federal matter." He refused to document her complaint that she was repeatedly threatened.

128.    Around that same time, Randle learned that a summons and petition for eviction against her had been filed in Wyandotte County District Court on July 13, 2023.  The petition sought $1,032.00 in back rent and unexplained fees. The action was never served on Randle, and it was later dismissed without prejudice.

129.    On or about July 24, 2023, Randle went to the KCKHA office again to see if she could work out her housing situation and get into a new unit that was free of hazards. She was deeply worried as she had nowhere else to go.

130.    No one in the KCKHA office would speak to Randle, and she was asked to leave. HR director Stephanie Drake, whom Randle had earlier met in the meeting with Tapia, rushed by her, stating she was going to a meeting.  Drake later told Randle that she couldn't talk to her if she had an attorney, but that if she did *not* have an attorney, they could drop the eviction proceeding.

131.    Randle decided it was not safe to remain in her housing unit. The threats by Hooks and Crockett alarmed her, and her crumbling unit was unsafe.  Randle felt constantly on edge and decided that she and her sons would temporarily stay with a friend or family while she tried to figure out how to secure new housing.

132.    While Randle was staying elsewhere, she heard from neighbors that an unknown vehicle had pulled up in her driveway and the persons in the vehicle had fired shots at her housing unit.  Randle felt in severe danger; she and her sons moved out in July 2023. They had nowhere to go at that time, but she knew that they were not safe at home. When they left, Randle had no ability to store all of the family's belongings, so some of the family's furniture remained in the unit until September 2023.

133.    For a time, Randle and her sons were effectively homeless, staying with various friends or family. Eventually, Randle was able to move her belongings and household items. It took months for Randle to settle elsewhere and provide her family with stability.

134.    Even after Randle moved out, however, she continued to suffer at the hands of KCKHA and its employees.  After dismissing without prejudice the lawsuit filed in July 2023 for $1,032, the KCKHA filed two months later a suit for $752 plus "accrued rent." Like the other suit, this one was dismissed without prejudice.  Even now, the KCKHA continues to claim that Randle owes $1,290.81.

135.    The year she spent with the KCKHA was deeply traumatizing to Randle and her family.  For nearly a year, Randle lacked reliable access to food that was sufficient to feed her rapidly growing teenagers.  Every day, Randle worried about providing proper nourishment for her children.  Her physical and mental health suffered drastically, causing or exacerbating a number of stress-related or chronic physical conditions.

136.    After leaving the KCKHA unit, Randle did not have stable housing for months. She continued to be threatened with outstanding invoices, which interfered with her ability to obtain new housing.

137.    The extortion that Randle suffered at the KCKHA was not unusual; other residents were also targeted and suffered a loss of their SNAP benefits.  Randle also heard that Thompson had a reputation in the community for buying food stamps, which is prohibited by federal law.

138.    Defendants reached an agreement and conspired between and among themselves to extort food stamps from residents and to use the residents' EBT cards for their own benefit. The tenants targeted by Defendants had no choice but to submit to the extortion, as their ability to secure public housing from KCKHA was conditioned on their turning over their SNAP benefits.

**COUNT I – Violations of the False Claims Act by Defendants The Kansas City, Kansas Housing Authority (KCKHA), the members of KCKHA Advisory Board, The Unified Government of Wyandotte County and Kansas City, Kansas, Andrea Tapia, Deborah Thompson, Monica Lopez and Jane Does #1-3 (collectively the "FCA Defendants")**

139.    Plaintiff re-alleges each and every preceding paragraph of this Complaint, as though fully set forth herein.

## The Federal Supplemental Nutrition Assistance Program

140.     Commonly known as the "food stamp" program, the Federal Supplemental Nutrition Assistance Program ("SNAP") enables low-income households to buy food using monthly benefits in the form of electronic benefit ("EBT") transfer cards redeemable for food at authorized retail stores.

141.     SNAP aims to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households. 7 U.S.C. § 2011; *see* 7 C.F.R. § 271.1.

142.     Approved retailers may accept SNAP benefits (commonly known as food stamps) in exchange for food items that are suitable for home consumption. *Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 375 (1st Cir. 2018) (quoting 7 U.S.C. § 2012(k)); see 7 U.S.C. § 2013(a)).

143.     These retailers may not dispense cash, hot foods, or non-food items in exchange for SNAP benefits. *See Irobe*, 890 F.3d at 375; 7 U.S.C. § 2012(k).

144.     When a shopper pays with SNAP benefits, he or she uses an electronic benefit (EBT) transfer card — which functions like a debit card — through a point-of-sale device to transfer the funds from the household's SNAP account to the store's bank account. *See Irobe*, 890 F.3d at 375.

145.     The Food and Nutrition Service Section (FNS) of the United States Department of Agriculture oversees the administration of SNAP benefits and EBT cards. As part of this oversight, the FNS collects data on every SNAP transaction.

146.     "EBT cards shall be issued only to households which have been duly certified as eligible to participate in the supplemental nutrition assistance program." 7 U.S.C. § 2016(a).

147.     "Benefits issued to eligible households shall be used *by them* only to purchase food from retail food stores which have been approved for participation in the supplemental nutrition assistance program at prices prevailing in such stores." 7 U.S.C. § 2016(b) (italics added).

148.     The SNAP program is carried out, and EBT benefits are administered, by state agencies including the Kansas Department for Children and Families ("KDCF"), which are required to strictly apply federal law and regulations governing the program and program benefits. 7 U.S.C. §2020.

149.     A Kansas resident may apply for SNAP benefits and an EBT card electronically or by paper application through a form and process administered by KDCF.

150.     An applicant with KDCF for SNAP benefits and an EBT card must, in order to receive benefits, certify and verify that she is the applicant, that she is eligible for SNAP benefits under federal law, and that she will comply with all laws governing the receipt of benefits.

151.     Retailers provide and accept EBT benefits solely under contracts authorized and governed by federal law and are subject to all applicable conditions of federal law and federal regulations.

152.     All EBT transactions at retail stores involve claims for funds of the United States. "Benefits issued and used . . . shall be redeemable at face value by the Secretary through the facilities of the Treasury of the United States." 7 U.S.C. § 2013(a).

28

153.     Only specific "households," defined by federal law, are eligible for the redemption of SNAP benefits and the possession and use EBT cards. *See* 7 U.S.C. §§ 2014, 2015.

154.     SNAP benefits and the use of EBT cards are "portable," meaning benefits and cards issued in one state may be redeemed and used in all states. 7 U.S.C. § 2016(j).

155.     The allotment of federal funds for SNAP benefits is required by statute to be precisely calculated to the nearest dollar, meaning each and every EBT transaction for SNAP benefits is material to payment of federal funds. *See* 7 U.S.C. § 2017(a).

156.     All issued SNAP benefits are obligations of the United States. 7 U.S.C. § 2024(d).

**The False Claims Act Violations**

157.     Plaintiff alleges that the FCA Defendants have violated the FCA by submitting or causing to be submitted false claims for payment or reimbursement from the federal government, by making false certifications upon which payments from the federal government were based, by conspiring to violate the FCA, and by committing "reverse" false claims through avoiding payments due the government.

158.     The FCA, 31 U.S.C. 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment, a violation of federal law.

159.     The FCA also makes "knowingly" making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, in order to get a false or fraudulent claim paid or approved by the Government, a violation of federal law.

160.     The Federal FCA further makes conspiring to commit any of the above acts under the FCA a violation of federal law.

161.    The FCA defines "knowing" as that a person, with respect to information, 1) has actual knowledge of the information, 2) acts in deliberate ignorance of the truth or falsity of the information, or 3) acts in reckless disregard of the truth or falsity of the information, and requires no specific intent to defraud.

162.    The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property, whether or not the United States has title to the money or property, which is presented to an officer, employee or agent of the United States; or which is made to a contractor, grantee, or other recipient (including a state or local governmental agency), if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

163.    The FCA Defendants, acting individually and in concert, violated the FCA each and every time they used Randle's EBT card to redeem benefits from a retailer.

164.    In submitting Randle's EBT card for SNAP benefits to which they were not entitled, the FCA Defendants knowingly presented or caused to be presented to the United States false or fraudulent "claims," including requests or demands for money or property to agents, contractors, grantees or other recipients of the United States.

165.    The money or property claimed by the FCA Defendants by presentment of Randle's EBT card to retailers was to be spent or used on the Government's behalf or to advance the SNAP program and the United States provided the money or property requested or demanded or reimbursed the retailers for the money or property requested or demanded.

166.     In submitting Randle's EBT card for SNAP benefits to which they were not entitled, the FCA Defendants had actual knowledge that their claims were false and fraudulent, were deliberately indifferent to the truth or falsity of their claims or acted in reckless disregard of the truth or falsity of their claims.

167.     Each EBT transaction using a card belonging to Randle was material to payment by the United States of money or property of the United States.

168.     Defendants Thompson and KCKHA also falsely certified an application for SNAP benefits, purportedly on behalf or Randle but for their own use, in order to obtain SNAP benefits to which they were not entitled.

169.     The false certifications of Thompson and KCKHA were material to the Government's issuance of SNAP benefits and to payment of money or property of the United States, through retailers, to the FCA Defendants.

170.     The FCA Defendants conspired to violate the FCA through knowing, concerted material misrepresentations and actions to obtain money or property of the United States to which they were not entitled, specifically, SNAP benefits rightfully belonging only to the United States and to Randle and her household.

**COUNT II – Deprivations of Due Process and Conspiracy to Deprive Plaintiff of Due Process Under Color of Law, all in Violation of the Fourteenth Amendment,42 U.S.C. § 1983 and the Kansas Constitution, Against All Defendants**

171.     Plaintiff re-alleges each and every preceding paragraph of this Complaint, as though fully set forth herein.

172.     Throughout Randle's entire tenancy at the KCKHA, up until its formal termination in September 2023, Randle was never afforded an opportunity to challenge her inclusion on the so-called "banned list." Randle's purported inclusion on the list had provided

Thompson, Lopez, Tapia and other Defendants with whom they conspired, total, unaccountable control over Randle's tenancy in public housing.

173.    The housing available through the KCKHA was a public benefit in which Randle had a property interest. Randle's interest was extinguished, in violation of due process, in the absence of any ability to seek redress through a fair administrative process. Neither the KCKHA nor the Unified Government had such a process, nor did they attempt to offer one to Randle.

174.    This control and leverage exerted by Defendants was aimed at extorting Randle's SNAP benefits, and, if she did not submit to extortion, to threaten to evict Randle or actually or constructively evict her. When Randle complained in June and July 2023 that her unit was unsafe and in disrepair, Defendants offered a unit that was even more hazardous and unsafe.

175.    By improperly conditioning Randle's tenancy on submission to extortion, all Defendants, whether participating directly or acting in concert with others in the extortion scheme, or by permitting or endorsing the extortion as a final policymaker, violated Randle's constitutional rights to procedural and substantive due process. Defendants' actions were intentional, reckless and malicious. In violating Randle's constitutional rights, Thompson, Tapia, Lopez and others conspired with each other and with the other individual Defendants, all of whom participated in or permitted the extortion scheme. Tapia and members of the Advisory Board were final policymakers for the organization and endorsed or ratified the extortion of residents for their SNAP benefits.

176.    Thompson, Lopez and Tapia and the other Defendants exerted unchecked and unaccountable power over Randle's tenancy, providing them with the leverage to extort

Randle and then constructively terminate her tenancy by refusing to provide a safe and appropriate housing unit when Randle resisted their extortion of her.

177.    Defendants' actions caused Randle and her children to suffer from inadequate nutrition and unsafe housing conditions as well as ongoing and persistent mental stress and anxiety from the threats to their safety and security.

178.    While impoverishing Randle through the extortion of her food stamps, Thompson and other KCKHA Defendants demanded rent payments, which were billed in unexplained and unpredictable amounts and which Thompson and other Defendants knew she would be unable to pay.

179.    Even after Randle moved out, she continued to suffer at the hands of KCKHA and its employees.  After nearly a year of extortion and being unable to provide a stable and adequate food supply for her children, Randle still supposedly owed KCKHA a total of $1,852.00, according to her "Tenant History Report."

180.    Defendants' deliberate, reckless and malicious actions violated Randle's rights to procedural and substantive due process under the Fourteenth Amendment of the United States Constitution and under Section 18 of the Bill of Rights of the Kansas Constitution.

181.    Defendants are liable based on their direct participation in the scheme, or by knowingly permitting or endorsing the scheme through an unwritten policy or practice that permitted the extortion of residents in return for public housing. Tapia and the members of the KCKHA Advisory Board were the final policymakers for KCKHA. They established the policies and customs for KCKHA that permitted and endorsed the extortion of resident for their SNAP benefits.

**COUNT III – Unlawful Deprivation and Conspiracy to Deprive Randle of First Amendment Rights and Retaliation for the Exercise of First Amendment Rights, Under Color of Law and all in Violation of the United States Constitution, 42 U.S.C. § 1983 and the Kansas Constitution, Against Defendants Tapia, Thompson, Lopez, Crockett, Hooks, and Jane Does #1 - #3**

182.     Plaintiff re-alleges each and every preceding paragraph of this Complaint, as though fully set forth herein.

183.     In July 2023, Randle reported to KCKHA director Tapia that Thompson had extorted her and demanded her food stamp card in return for housing. Randle knew that Tapia had been aware of the extortion, but Tapia did not admit her knowledge or that she had actively or knowingly permitted Thompson's conduct or that of Lopez.  She also did not acknowledge that she and other "Jane Doe" employees benefitted from the use of Randle's EBT card.  Both Thompson and Lopez were subsequently terminated because of their use of Randle's card, but they remained in close and regular contact with the KCKHA and the persons employed there, including Tapia, Crockett and Hooks.

184.     In July 2023, Defendant Jerome Hooks, employed at KCKHA in Housing Operations, confronted Randle in public when he learned of her report to Tapia. He approached Randle at a store and warned in a threatening tone: "Watch your back!"

185.     A short time later, Randle saw Hooks at an indoor basketball game where one of her sons was playing. Hooks again approached her, threatening her, bullying her, and loudly berating her over the termination of Thompson.

186.     Anwar Crockett, assistant director of housing operations and management, was also a close ally of Thompson.  When assigned to work with Randle on locating a new unit, instead of showing her an appropriate unit, he berated Randle as a "snitch" for talking to

Tapia. He told Randle: "That's fucked up!"  Like Hooks, Crockett told Randle: "Watch your back."

187.        Hooks and Crockett's threatening statements to Randle were in express retaliation for her exercising her First Amendment rights to free speech and seeking redress for the violations of her rights by Thompson, Lopez, Tapia and others.  Randle was alarmed by Crockett and Hooks' threats to "watch [her] back" and labeling her a "snitch."

188.        Hooks and Crockett's statements were intended to and did chill Randle's exercise of her rights under the First Amendment. In retaliating against Randle for the exercise of her First Amendment rights, Hooks and Crockett conspired with each other and with other Defendants, all of whom were aware of and permitted the extortion of residents' EBT cards in return for housing. Tapia and members of the Advisory Board were final policymakers for the KCKHA, and they established and endorsed the customs that permitted the extortion of residents.

189.        Although she had no other housing, Randle moved herself and her children out of KCKHA housing.  Randle feared for the safety of herself and her children She also suffered from ongoing and persistent mental stress and anxiety from the threats to her family's safety and security.


**COUNT IV – Violations of the Kansas Consumer Protection Act by Defendant KCKHA**

190.        Plaintiff re-alleges each and every preceding paragraph of this Complaint, as though fully set forth herein.

191.        Defendant KCKHA is a supplier under the KCPA.

192.        KCKHA supplied and leased housing to Randle.

193.      KCKHA engaged in consumer transactions with Randle when it leased housing to Randle for her benefit.

194.      In connection with consumer transactions, KCKHA knowingly and willfully engaged in the following deceptive acts and practices:

    a.  Converting and extorting Randle's SNAP benefits to its own use and the use of Randle to obtain housing for herself and her family;

    b.  Submitting a falsified application, with certifications of truthfulness and accuracy, on behalf of Randle and then converting, extorting and using the issued EBT card for its own use and the use of others instead of for Randle's use;

    c.  Threatening Randle with termination of her lease and with physical and mental harm should she refuse to hand her EBT cards over to Defendants and in retaliation for Randle's coming forward and disclosing Defendant's false and fraudulent use of her EBT card;

    d.  Bringing an eviction lawsuit against Randle because of Randle's refusal to remit her EBT card to Defendants in exchange for housing and because of Randle's disclosure of Defendants' EBT card scheme.

195.      KCKHA made representations that its property and services possessed characteristics they did not have, including that residence at a KCKHA property required Randle to remit her EBT card and SNAP benefits to Defendants.

196.      As a direct and proximate result of KCKHA's violation of the KCPA, Plaintiff has suffered actual damages, including financial loss, loss of SNAP benefits, loss of housing, physical threats, food insecurity for herself and her family, and severe emotional and physical harm and distress.

WHEREFORE, for the foregoing reasons, Plaintiff-Relator Andrea Randle, acting on behalf of the United States of America and on her own behalf, requests that judgment be entered as follows against the Defendants:

(a) In favor of the United States against the FCA Defendants for treble the amount of damages to the United States from the false claims submitted, plus maximum civil penalties of Twenty-Seven Thousand Eight Hundred Ninety-Four Dollars ($27,894.00), or such maximum amount as provided by law on the date of judgment, for each false claim;

(b) In favor of the United States against the FCA Defendants for disgorgement of the profits earned by them as a result of their unlawful conduct;

(c) In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. §3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d) For all costs of the Federal FCA civil action;

(e) In favor of Plaintiff and against all Defendants for actual and consequential damages for violations of 42 U.S.C. § 1983 in an amount to be determined at trial;

(f) In favor of Plaintiff and against all individual Defendants for punitive damages for violations of 42 U.S.C. § 1983, in an amount to be determined at trial that will deter such conduct by Defendants in the future;

(g) In favor of Plaintiff for pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all claims pursuant to 42 U.S.C. § 1983;

(h) In favor of Plaintiff and against all Defendants for all actual, compensatory, and statutory damages available under the Kansas Consumer Protection Act, including an award of costs and attorney fees incurred by Plaintiff; and

(i) In favor of the Plaintiff-Relator and the United States for such other and further relief as this Court deems to be just and equitable.

## DEMAND FOR A JURY TRIAL

Plaintiff-Relator respectfully requests that the issues in this matter be heard by a jury.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff-Relator hereby designates the Federal Courthouse in Kansas City, Kansas as the place of trial in this matter.

Date: March 28, 2025                    Respectfully submitted,

*/s/ Cheryl A. Pilate*
Cheryl A. Pilate #14601
Morgan Pilate, LLC
926 Cherry Street
Kansas City, MO 64106
Telephone: (816) 471-6694
Facsimile: (816) 472-3516
cpilate@morganpilate.com

*/s/ Anthony E. LaCroix*
Anthony E. LaCroix    KS No. 24279
LaCroix Law Firm, LLC
1600 Genessee, Suite 956
Kansas City, Missouri 64102
Telephone:  (816) 399-4380
Fax:  (816) 399-4380
Email:  tony@lacroixlawkc.com

*Attorneys for Plaintiff-Relator*